May it please the court, Steven Sanven appearing on behalf of Appellant. Our lead plaintiff is Darlene Yazzie. She's a 71-year-old Navajo Nation tribal member. She raises sheep for her meat. Darlene hauls water for her home livestock and only has electricity for the last 10 years. Darlene Yazzie lives on a fixed income. She doesn't have internet. It's an 18-mile round trip to her post office box. And each of these appellants live in the Four Corners area and have similar challenges. Each one of these appellants are members of a protected class under Section 2 of the Voting Rights Act. In response to the court's October 9th order regarding regressibility, we believe that the harm can be regressed by ultimate authority on Arizona's election rules and the county recorders are bound by her decisions. But going ahead and adding the county recorders is an easy process. So plaintiffs filed their motion yesterday for leave to amend the complaint for injunctive and declaratory relief. And then Secretary Hobbs convenes in her answering brief, page 17, that those recorders have the power to address the injury here. Our concern is that the district court didn't apply our voting rights denial claim under Section 2 consistent with the court's order in DNC-Hobbs that was issued by the panel earlier this year. There's a two-step process that we tried to follow. First, whether the challenge standard practice or procedure results in a disparate burden on members of the protected class, we believe we established that. And then second, after that disparity, the district court failed to go ahead and go through the totality of the circumstances argument. Before you move ahead to the merits of the Voting Rights Act claim, I have some other questions on redressability. Because according to the record, as I understand it, you simply want a change in state procedure for these counties, for native voters of the Navajo Nation who live on the reservation. And so my question is, since the record shows that it's not even clear that ballots are actually postmarked, and that you can't even tie up which ballot from someone who is an on-reservation resident, how could the Secretary of State feasibly redress this claim? It's my understanding, Your Honor, from the New York decision that all these ballots have to be postmarked now, and each precinct on the reservation to be identified. Where is that in the record? I'm finding that in the transcript, Your Honor. Because that doesn't match up with the declarations. Counsel, while you're looking for that, the other question I had that's similar is, I'm wondering if the ballots in Arizona tell you whether the person that's mailed it to you is an Indian, even if it came from a particular location. No, they can't. They just identify by precincts, Your Honor. And I assume that the Navajo Nation also has individuals living on the reservation who are not So how, as a practical matter, it seems to me you have a major regressibility issue, because even if there isn't a mailing problem, and that's not what the declarations say, you have, as I intimated and as Leili asked, if you can't match the ballots with the voters. So how is, you know, even if you got an extension to the postmarked date as opposed to receipt date, how would that change anything? If, I'm sorry, Your Honor, if I can answer the first question on the, in the Southern District of the New York opinion, and we, that's in the hearing transcripts on page 22, beginning at line 23, Jones versus the United States Post Office document 120-CV6516, that went ahead and ordered that the post office will be required nationwide to deliver ballots by first class mail, and that went ahead and took care of the postmark issue. I don't think, wait, wait, wait, that's not testimony in this case, and I don't, we don't have any actual record in this case. In fact, our record says the opposite. So I don't, I don't think you can rely on that, because to say that it has to be sent by first class mail is not the same as saying you have a postmark with the date and location. I'm continuing to review the transcript, Your Honor. All right, well, why don't we go ahead and you continue with your argument, and then when you're rebuttaling, if you can find the evidence in the transcript, you can advise us. Let me ask you another question, counsel, which maybe because I don't understand the law as well as I should, but one of the things that occurs to me that if we were to issue an order that told the state of Arizona to take one set of ballots and count them after the deadline, but others would not be counted in the same manner, that that raises an equal protection problem. And I haven't researched it, but it seemed like the first thing someone would say is I mail my ballot on the day that they come from a tribe did, and they got there late, and you counted the tribal ballot, but not mine. And that's a denial of my rights to have my vote counted on the same basis as someone else's. And I don't see where that's brief, but it seems obvious to me that you'd have some sort of problem with equal protection. Yep. One of the things, your honor, with the protected class of voters at Navajo Nation that we're representing, everyone would have a rule where their vote would be counted. Because of the slower mail service up at Navajo Nation, by comparing Scottsdale voter on the permanent early voting list, they'll have 25 days to consider their ballot and meet the receipt deadline. But again, a Hope So voter, where mail may take 10 days to deliver, only has seven days to consider their ballot. So I think any equal protection arguments could be answered with the slower mail delivery services that are located in this rural part of the nation's largest big land-based reservation. Well, what we're doing is not addressing more time to consider it. What we're saying is going to be considered as having been received, which is a different issue. If I vote, even if I've had lots of time to consider the ballot and mine's received late, but the one that we've enjoined is also received late and mailed at the same time, that's the violation. You're not going to count my ballot. I haven't done any research to see if there's an equal protection problem. I don't want to go off on a red herring, but it seems to me just on its face that there's a problem with, I think it happened in Bush versus Gore, where some votes are counted and treated differently than others, and the Supreme Court wouldn't let them do that. And I would think the first thing we would get would be someone saying, I'm an Indian in another tribe down in a part of Arizona, and my vote, I didn't get to do that. And you've rejected my votes, but not those of the tribe, the Navajo tribe, and it would be treated differently. It wouldn't have to be a tribe either. It could be just other voters that contend that their votes are being treated different tribe. Right. But because, Your Honor, because the ballots don't go ahead and identify whether someone's Indian or non-Indian, under our proposed postmark rule, if all the Navajo precincts, you could count every vote and everyone would go ahead and be treated equally, or our requested relief could be expanded to all of Indian country in Arizona, to each of the reservations. Well, first of all, you did not ask for relief on behalf of all Indian country, and you only asked for, you know, you asked for relief on behalf of these individual plaintiffs. So it seems to me that you can't expand it now. It's too late for that. And just following up with Judge Whaley, all of the other voters in Arizona, both Native voters and others, would be obliged to meet the receipt deadline, and you carve out just three counties. And so, again, it's not clear to me how the Secretary of State or the county recorders could even grant the relief you asked for for the three counties. Could you elaborate on that? Your Honor, we believe that there would be equal protection issues if we went ahead, applied the postmark rule to the entire Navajo Nation, where these plaintiffs are. And I'd like to reserve the rest of my time for rebuttal. Thank you. All right, you may. Mr. Donofrio? Good afternoon, Your Honors. May it please the Court. I appreciate the Court's entertaining my late-filed motion to appear and allowing me to appear on behalf of the League of Women Voters. Your Honors, on behalf of the League, I want to speak a bit to the District Court's analysis of the disparate burden aspect of a Section 2 claim. And it sort of ties in with Judge Whaley's equal protection question. To properly analyze the finding of a disparate burden, underneath that has to exist a set of conditions that applies to a protected minority that warrants relief on behalf of that group. And in that way, I think Judge Whaley, and like you, I have not had time or occasion to think through your equal protection question, so I'm not sure if I'm getting it right. But I think the Section 2 analysis tries to, or does, account for that potential imbalance by requiring a plaintiff to show that they face a disparate burden because they are part of a protected minority. Even assuming that that's true, that the showing of a disparate burden would establish a Section 2 claim, can you address Judge McEwen's redressability questions in terms, as a practical matter, how do you sort these ballots? So Judge Nguyen, I confess that on behalf of the League, I did not become an expert in the ins and outs of the voting laws and the precise way in which the ballots would be handled. Certainly, as Judge McEwen identified, there is a potential disconnect between the relief sought and relief that would redress the problem for all Native American voters in Arizona. The League's concern here, Judge Nguyen, is to make sure that the panel kind of sees and focuses in on some of the analytic errors that the district court judge made in applying the disparate burden aspect of the Section 2 analysis. The critical mistake that the judge made was that the judge essentially required the plaintiffs to provide a quantum of proof beyond what's required by Section 2 of the Voting Rights Act. The circumstances here are quite different from, for example, the case that three of your colleagues heard last night, the Mi Familia Vota case. Circumstances here are different in that this court in DNC v. Hobbs essentially did the work of sort of cataloging and detailing the historical and social conditions faced by voters like the appellants, Native American voters living on reservation. And there's no dispute as to the nature of those conditions and the effect that those conditions have in terms of making it more difficult for these voters to access the ballot. In essentially requiring the plaintiffs to show more, for example, a statistical connection between a past result and the ballot deadline. The district court judge sort of loaded more onto the Voting Rights Act, Section 2, and is there. The language of the act is clear. The case law that we've cited in our brief is clear. The touchstone of the analysis is whether a protected class of voter has a lesser opportunity to access the political process than other voters. I think that's a concept that we agree with. But we have to look at the evidence of this case, Mr. D'Onofrio, and we have, and they're usually, of course, in these Voting Rights Act cases, there is statistical data that is looked at and compared between the minority and non-minority voters. And here the report that was provided only talks about some of the Navajo Nation voters and Scottsdale voters. And it seems to me that with that thin record in terms of the remedy that's asked for, that the district court couldn't give the remedy asked given the evidence. What is your comment on that with respect to access to the ballot? So, Judge McHugh, my response there is that, again, I think what makes this case unique is the work that this court did in DNC v. Hobbs in essentially creating the factual record that forms the foundation of the plaintiff's Section 2 claim here. It's not like League of Women Voters v. North Carolina, where the plaintiffs, but by the nature of the relief they were seeking and the nature of the law that they were challenging, the plaintiffs, they needed more. They needed some statistical evidence here. The work this court did in DNC v. Hobbs in kind of cataloging and laying out the conditions for the voters is the evidentiary connection that links the harm that these voters face in the continued application of the ballot deadline. I thank you very much. Can I ask a quick question with regard to the geographical areas? There's nothing in the record that indicates what percentage of individuals living in these affected counties are Native Americans, right? And also related to that, what percentage of Native Americans live on reservations in these particular counties? Is there anything in the record that tells us that? Judge Nguyen, not that I'm aware of, but I'll defer to Mr. Sandin when he comes back on rebuttal. Thank you very much, your honors. Thank you. We'll now hear from Ms. Desai. Good morning, your honors, and may it please the court. Rupali Desai from the law firm of Coppersmith Brockelman, representing the Secretary of State Katie Hobbs. I'm going to start with the question that the court asked us to address this morning, which is the issue of constitutional standing and particularly the redressability prong, and whether the secretary can effectuate the requested relief. Plaintiffs lack standing because their alleged harms are not redressable by this court because they fail to name the necessary parties, and the secretary cannot provide the relief they seek. In response to the question of whether or not, Judge McQueen asked whether or not the secretary can feasibly identify which ballots to allow and count. There are two reasons why the answer to that question is no. The first is the secretary does not receive ballots from these voters. Ballots that get cast by voters in Arizona go to the county recorders in the counties in which the voters reside. The secretary has no function to collect, allow, open, tabulate, count ballots whatsoever. The second reason that she's unable to provide the relief that plaintiffs have sought is to Judge Whaley's question. There's no way to determine if someone is a member of, one, the Navajo Nation, and two, living on the reservation. As Mr. Sandovan indicated, there may be information on a ballot with respect to a precinct. The amount of work for a county recorder, and again, this is not the work that the Secretary of State does, but if a county recorder were to scrape a particular precinct ballot, they would have to identify which precinct that ballot came from, then determine whether that precinct is within a particular geographical area, such as the tribal lands, there are other areas, so they would have to identify where the precinct is, and then, and this is really the significant problem, they would have to determine if the voter is, in fact, a member of the Navajo Nation. There is nothing on voter registration cards or the ballot for that matter, and in fact, we believe it would be problematic to be identifying voters by their racial or ethnic identity or the fact that they are a tribal member. That information doesn't exist on the ballot, so you cannot identify which people the plaintiffs believe should be benefiting from the relief that they're seeking in this case. Putting aside the standing for a moment with respect to the question of redressability, the process that I just described raises significant issues under the Purcell Doctrine. Purcell cautions against voter confusion and significant administrative burden in very short periods of time before the election. We have both of those things here. If the court were to reverse and allow plaintiffs to obtain the relief that they're seeking, first of all, the voters in Arizona have received information already because early voting began a while back. They've received information that the so in late September ballots were sent to overseas and military voters. So that really is the start of when voting began. On October 7th is when early ballots were sent to all voters who are registered in Arizona as part of the permanent early voting list. So those ballots went out as of October 7th and since October 7th there has been early voting at various sites throughout Arizona. On the ballot envelope itself in the publicity pamphlet that gets mailed to every voter on the websites that the county recorders, the Secretary of State, and the Clean Elections Commission put out, there is a tremendous amount of information that the deadline to submit your ballot is election day at 7 p.m. Changing that deadline, especially for a subset of voters, would create an incredible amount of confusion. What if somebody who is a member of the Pascua Yaqui tribal nation in southern Arizona thought that the order that was intended to allow all Native Americans in Arizona to postmark their ballot as opposed to having it returned on the receipt, the election day receipt deadline? That would create significant confusion for voters to know does this relief that is sought by plaintiffs, would it apply to one Native American voter versus another? But more than that, the process that I described would require a significant amount of administrative burden for county elections officials who are not currently staffed, trained, and set up to go through the process to determine whether or not a ballot that's received post-election day did in fact come from one of the voters that Mr. Sandovan described should get this relief. In addition to the redressability issue and the Secretary of State's ability, and I want to just talk about that for a moment, I'm not sure which council indicated that the Secretary has the ability to do this or governs the county recorders. It's simply not true. In Arizona, the Secretary of State is the chief elections officer, but she does not have binding authority on the county recorders. There are two ways that county recorders get instructions about the work that they do in elections. That's through the statutes and what the legislature passes. And then there's the elections procedure manual, which is the equivalent of the Secretary promulgating rules to fill in the blanks and provide some administrative guidance to county elections officials about how to run elections. But that process requires, just like normal rulemaking, a period of time where they put the elections procedure manual out for comment. And ultimately, it must be approved by the Attorney General and the Governor. So it is not something that the Secretary can unilaterally amend. I'd like to ask you about that because obviously the Secretary of State may not be able to, but in a Voting Rights Act case, the Secretary of State is the appropriate defendant. And if it was October 2020, but let's say it was soon after the manual had been finalized and a court ordered that the procedures be changed, the Secretary of Court order, correct? Correct, Your Honor. If there was a court order declaring that a particular statute was unconstitutional, of course the Secretary would comply with the order. And the process that we would follow is amending the elections procedure manual and then obtaining the approval of the Attorney General. That elections procedure manual doesn't have the force and effect of law until it goes through the process of approval through the Attorney General's office. So of course, if there's a law in Arizona that's declared unconstitutional, we would comply with that order. We would still argue, however, that the appropriate parties to be the indispensable parties that are required for a case like this, where a mandatory injunction is being requested, are the individual recorders who affirmatively have to take the steps to count the ballots that were cast or in postmarked after the receipt deadline. So the Secretary may be the appropriate defendant for purposes of amending the procedures manual, but you also need the county recorders who are the individuals who are doing the actual work that would be the subject of the mandatory injunction. I want to also talk about a couple other significant standing issues that the Secretary raised in a motion to dismiss that was filed with the district court in advance of the preliminary injunction hearing, but that the court deferred for later decision. But we think these jurisdictional issues foreclose the relief that plaintiffs seek and provide an alternative basis for affirming the trial court's ruling. The parties before the court have not provided any allegations regarding their own injury. In fact, there are no allegations in the complaint, nor did any of the plaintiffs testify at the injunction hearing about the fact that they intend to participate in the 2020 election, that they themselves are planning to use a vote-by-mail ballot, and there is no evidence in the record that they have ever previously submitted a ballot that was rejected because they suffered from some sort of mail delay or the fact that their ballot was too late counted. That goes to the particularity of injury. That's correct, Your Honor. And finally, the plaintiffs lack standing because the harms that they allege are not fairly traceable to the Secretary and the receipt deadline. The Secretary acknowledges the hardships that Navajo Nation members face, such as poverty, isolation, the hardships of traveling on the Navajo Reservation, and unreliable mail service. But those harms are not traceable to the Secretary or, more importantly, to the receipt deadline. And Judge Snow, in his order, talked about this, that many of the voters, he states in his ruling, that many of the issues Navajo voters face in accessing the postal polls are not a result of the receipt deadline and will not be remedied no matter when the deadline to receive the ballot is. There are no facts in the record or evidence presented by the plaintiffs that, if the receipt deadline were somehow to be modified, that that, in fact, would address the many other allegations of harm that plaintiffs set forth in their complaint. I want to address a question that I think Judge McEwen, you asked about whether or not the ballots are postmarked so you can know whether they were postmarked by Election Day. There is a, the DeJoy case indicated that ballots needed or held that the post office needed to postmark ballots for the 2020 election. What I can tell you is that while that order came out and, in fact, the National Association of Secretary of States held a call with our Secretary of State and indicated that the plan was to do that, there has been no confirmation that it is actually happening. And, frankly, we have no way of knowing whether or not the post office is postmarking every ballot. So I think the answer to your question is probably they're being postmarked, but there isn't confirmation or certainty that that's occurring in every case. Let me ask you another question. If, if the deadline were changed to postmark rather than receipt, what would that do to the cure deadline for individual voters? Yeah, this, this is one of the problems that we raise in our papers and would, would result. And this is also part of the broader Purcell issue, which is there are these existing procedures and statutes, including the cure period. So currently in Arizona, you have up to five days after the election to cure a ballot with a, with a mismatched signature. So the signatures don't match. Or if you have, and this wouldn't apply to the conditional provisionals because those are cast at polling places. So if an individual submitted their ballot and it arrived and the plaintiffs are asking for relief up to 10 days. So any ballot that is postmarked by election day and received up to 10 days after the election. So conceivably somebody could do that, have their ballot arrived to a County reporter on the sixth day after the election. They, if they have a mismatched signature, they wouldn't be able to avail themselves of the cure period. That's allowed by statute, which is five days after election day. So there would be an impact for those voters. And in fact, they wouldn't be able to avail themselves of the same cure period that other voters in Arizona are allowed. So with respect to the postal service, is there a gap at all between the court order in New York and the timing of the ballots from that Arizona has out and about, so to speak? Yeah, it's a good, it's a good question. The ruling from DeJoy came out prior to our mailing on October 7th of early ballots. So if the post office is in fact complying with that order, it's, we should, any ballot that is returned by a voter post October 7th. So conceivably somebody returned their, got their ballot on October 7th and returned it on October 8th. They, it should have a postmark on it because DeJoy was decided prior to our mailing those early ballots. Thank you. I want to spend a moment talking a little bit more about Purcell. The district court in a footnote talked about how Purcell actually, if not for having decided this case on the merits, Purcell warns against the relief that plaintiffs are requesting so late. And we believe frankly that Purcell is enough to affirm the lower court's decision without reaching. The secretary presented a significant amount of evidence both through her declaration but also testimony at the hearing about the fact that changing the time would cause voter confusion, hardship to elections officials, and ultimately the request that is sought is too close to the procedures such as the cure, the cure deadline that your honor just asked about. I don't want to spend too much time on the, on the VRA claim because I think our papers really address the argument. I will, I will just note a few things that Mr. Donofrio mentioned, which is this, this idea that the trial court used the wrong standard. It's simply not the case that trial court was requiring plaintiffs because somehow they were impacted differently than other rural voters. The plaintiffs did not claim at all through evidence, statistics, expert testimony, or even in the bare allegations in their complaint, that a single mail-in ballot cast by an on-reservation Navajo Nation voter was rejected because it arrived past the deadline. That kind of information is critical and is in stark contrast to the evidence that was presented in cases like DNC where there was, for example, in that case and this, the notion that DNC somehow provided the factual or evidentiary record for the relief site in this case is, is mind-boggling to me. That case was different and had different facts and the allegation there was that out of were treated differently and impacted and not counted to the same degree as white voters ballots. That is different than the receipt deadline and frankly the evidence, the sort of evidence that was presented in DNC is in stark contrast to what was presented by plaintiffs in this case. And the court's discussion of the rural voters, I will note, and we say this in our papers, was merely to illustrate that appellants failed to show a disparate racial burden as opposed to a burden falling on geographic lines. So what we saw is that if, if these particular Navajo Nation voters are in fact suffering from delayed mail delivery, then it's not necessarily the case that that's disparately burdening their right to vote because other voters in Arizona who simply based on geographical location may be suffering the same kind of slow mail delivery. So I think that that, the distinction that the court drew and, and what's been drawn, really taken out of proportion here is the court's discussion about rural voters. It wasn't that it changed the test, it used the correct test. It's just that there wasn't the evidentiary support for plaintiff's claims. Unless the court has any other questions for me, I will submit the rest of my argument on the papers that we filed and respectfully request that the court affirm the trial court's order. Thank you. Thank you. Here's no additional questions. So we'll return then to Mr. Sandman. Thank you. Appellants, they only have to establish they have fewer opportunities to compare to other voters, not, not rural voters. When you look at the target areas, the selection areas that were a mid-resourced area, Scottsdale and Maricopa County, a mid-resourced area, Flagstaff, and then a poorly resourced area at Navajo Nation. Flagstaff is the county seat, Holbrook is the county seat of Navajo County, St. John's is the county seat of Apache County. What the court did though, when they went through, they found disparities between the urban areas and the appellant. And then on 006, the court went ahead and said in lines one that the evidence shows disparities as to Navajo voters, a protected class versus rural voters, a non-protected class. So, so they went ahead and carved out these rural voters after identifying on page 005, all the disparity. That plaintiff's estimated that a Scottsdale voter on the permanent early voting list will have 25 days to consider their ballot and meet the receipt deadline, while a Den Ahotso voter, where mail may take up to 10 days to deliver, only has seven days to consider their ballot. Plaintiffs further showed that a Scottsdale voter that requests a ballot on October 23rd has nine days to consider their ballot, while a Den Ahotso voter does not have enough time to mail their ballot at all. The court also put on, district court also put on page four, for instance, at 005, in Scottsdale, there's only one election day polling location per 13.14 square miles, where in Navajo Nation there, it's only one location per 306 miles. Then they talked about Navajo Nation members to access, include that it is difficult for Navajo Nation members to access the postal services because of lack of home delivery, the lengthy distance it takes to get to the post office and reservation, and the fact that many Navajo Nation members have insufficient funds to travel to a post office. Additionally, post office are generally not open for as many hours on reservation as they are offered off reservation. This is in the court's order on page 005. And then on the top of page 006, they carved out this group of voters, rural voters who are not a protected class in this nationwide election, instead of allowing the comparison to occur against all Arizona voters. The damages here are less opportunity. It requires only that plaintiffs, appellants establish that they have less opportunity to participate relative to other voters. We don't need to show that they have no opportunity to vote. Appellants must only show that they have less opportunity to vote as compared to other voters. One of the other questions we did underneath our expert did go ahead and talked about eight times greater disparity, eight times greater rejection of Native American ballots when compared to whites, and cited the report demonstrating same in February of 2020, a recent report. The damage here is less opportunity. There's three ballot delivery systems. When you compare the appellant's mail time to other voters in the state of Arizona, not just the rural voters, you see a tremendous disparity that goes ahead. And it was cited by the court. Your honors, also... Mr. Sandovan, I've let you go over your time, so would appreciate it if you could move toward wrapping up. All right. And even, and of our excerpts, the Secretary of State acknowledges that many tribal members face challenges to voting by mail due to limited mail service and language assistance needs. We ask that the test in DNC versus Hobbs be applied where the court is required to go through the totality of the circumstances and the applicable Senate factors 1, 5, and 8. Thank you, your honor. Thank you. I'd like to thank all counsel for your argument. The case of Yazzie versus Hobbs is submitted and we're adjourned for the morning. Thank you, your honor.
judges: McKeown, Nguyen, Whaley